**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:19-cr-130(8) |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| MAURICE JACKSON, | : | |
| | : | |
| Defendant. | : | |
| | : | |

---

## ORDER DENYING MOTIONS TO SUPPRESS

---

This case is before the Court on the three motions to suppress filed by Defendant Maurice Jackson. (*See* Docs. 711, 712, 713.) These motions seek to suppress evidence obtained from (1) the GPS tracking device appended to his vehicle; (2) the pen register/wiretap on his phone[1]; and (3) the search of his residence. The Government filed an omnibus response in opposition (Doc. 732), and the Court held a hearing on June 15, 2021, thus making this matter ripe for review. For the reasons below, Jackson's three motions to suppress are all **DENIED**.

### FACTS

In August 2018, the DEA initiated a comprehensive investigation into the Derrick Bryant drug trafficking organization, which is alleged to have smuggled hundreds of kilograms of cocaine, heroin, fentanyl, and methamphetamine into the United States for

---

[1] Although Jackson styles his motion as a constitutional challenge to the "improper pen register/wire tap," (*see* Doc. 712), the warrant at issue is the Government's application for a wiretap — not pen register — as discussed in more detail below.

wide-spread distribution. The present dispute pertains to that investigation only as it relates to Jackson, who is just one of the thirty-nine co-defendants charged in this case.

In October 2018, agents received information from a credible source that Jackson was working for the Bryant DTO as multi-kilogram cocaine distributor. Among other things, the source notified law enforcement that Jackson lived at 12010 Chardon Lane and drove a black Lincoln model SKS sedan.

On February 20, 2019, agents initiated surveillance on Bryant's truck while it sat in a Hooter's parking lot. Sometime thereafter, an agent observed Jackson and Bryant approach the truck together and briefly interact. After Bryant hopped back into his truck, Jackson walked away and got into a black Lincoln sedan. Jackson asserts that the two were merely "exchanging pleasantries at Hooters." But the agent—suspicious that more illicit behavior was afoot—decided to follow. Sure enough, Jackson eventually turned onto Chardon Lane and parked his black Lincoln sedan outside of house number 12010. Two days later, agents conducted a trash search at the Chardon residence and recovered packaging materials consistent with the shape and size of a kilogram of narcotics that subsequently tested positive for the presence of cocaine.

Based on the information they had gathered, agents sought and obtained a warrant authorizing the installation of a GPS tracker on Jackson's car. The tracking device was installed a week later and re-authorized five more times thereafter.

In March 2019, an existing court-authorized wiretap on Bryant's phone picked up a call with Jackson. The government therefore sought and obtained a wiretap on Jackson's phone, which was re-authorized an additional seven times.

In October 2019, agents began executing search and arrest warrants on many of the known members of the Bryant DTO, and, on October 23, executed a search warrant at the Chardon residence. Jackson was arrested and agents recovered (among other things) two kilograms of cocaine, a firearm, gallon size zip lock bags filled with cocaine residue, baggies for packaging, digital scales, cocaine packaged for sale, and large stacks of cash banded together with rubber bands.

The investigation into the Bryant DTO culminated in a Superseding Indictment that alleges twenty counts against thirty-nine co-defendants. Jackson is charged with Counts I (narcotics conspiracy) and III (possession with intent to distribute).

## ANALYSIS

Jackson now moves to suppress any and all evidence obtained by the (1) GPS tracker on his car, (2) pen register/wiretap on his phone, and (3) search of his residence. Each argument is discussed in turn below.

## I. GPS Tracker on Jackson's Car (Doc. 711)

Jackson first seeks to suppress all evidence obtained as a result of the GPS monitoring of his vehicle because (he contends) the warrant authorizing the tracking device was not supported by probable cause.

Of course, as the Supreme Court has held, "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'" *United States v. Jones*, 565 U.S. 400, 404 (2012). Therefore, under Fed. R. Crim. P. Rule 41(c)–(d), "a magistrate judge must issue a tracking-device warrant if a supporting affidavit establishes probable cause to believe

3

that the device will uncover evidence, fruits, or instrumentalities of a crime." *United States v. Coleman*, 923 F.3d 450, 454 (6th Cir. 2019). "Probable cause exists when there is a fair probability, given the totality of the circumstances, that contraband will be found in a particular place." *United States v. Rodgers*, 536 F. App'x 621, 624 (6th Cir. 2013).

Jackson argues that the affidavit here did not contain facts to support such a determination (*i.e.*, that there was a "fair probability" that GPS monitoring of his vehicle would uncover evidence of a crime). The Court disagrees.

The affidavit reflected that, on February 20, 2018, Task Force Officer Whitford observed Jackson interact with Bryant—the suspected leader of a massive DTO—and then drive to 12010 Chardon Lane in a black Lincoln sedan. (*See* Doc. 732-1, ¶¶34-36.) This behavior was entirely consistent with the information previously provided to law enforcement: that Jackson was (1) a multi-kilogram distributor who (2) resided at 12010 Chardon Lane and (3) drove a black Lincoln sedan. This was only further corroborated by the fact that agents recovered packaging materials in the Chardon residence's trash that tested positive for cocaine. (*Id.*) Taken together, these facts indicate that there was a fair probability that the use of a GPS monitoring on Jackson's vehicle would uncover further evidence of a crime. *See, e.g., Coleman*, 923 F.3d at 454 ("Courts have upheld vehicle-tracking warrants based on much weaker factual allegations than these."). The affidavit supporting the tracking device warrant was thus supported by probable cause.

## II.    Pen Register/Wiretap on Jackson's Phone (Doc. 712)

Second, Jackson seeks to suppress all evidence obtained from the pen register/wiretap on his phone. However, his challenges are truly directed at the

4

constitutionality of the application for the wiretap warrant—not the pen register.

As an initial matter, it is important to first recognize the differences between a "pen register" and a "wiretap." Pen registers only capture incoming/outgoing phone numbers and times—not locations of the caller or communications. They are "the most easily obtainable," *United States v. Powell*, 943 F. Supp. 2d 759, 769 (E.D. Mich. 2013), *aff'd,* 847 F.3d 760 (6th Cir. 2017), and only require that the governments certify that the "information likely obtained by installation of a pen and its use is relevant to an ongoing investigation." *See* 18 U.S.C. §§ 3122(b)(2) & 3123(a)(1).

A wiretap, however, is much more intrusive and intercepts real-time communications, such as voices in a call or text messages. They have very specific requirements that are codified in 18 U.S.C. §§ 2510–2522 ("Title III"). To obtain a Title III wiretap, the government must make a showing of what is sometimes referred to as "probable cause plus." *Powell*, 943 F. Supp. 2d at 769-70. The "plus" refers to the statutory "necessity requirement" of 18 U.S.C. § 2518(1)(c), which dictates that a wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id*.

Here, Jackson contends that (1) the application for the wiretap warrant lacked probable cause, and (2) the government failed to meet its burden of demonstrating necessity. The Court has reviewed the wiretap applications at issue, which were filed under seal. (*See* Doc. 730.) Upon said review, the Court finds that Jackson's challenges fail in both regards.

*Probable Cause*.  First, the wiretap applications were supported by probable cause.  The first wire, which was obtained in March 2019 and authorized by United States District Judge Michael R. Barrett, contained a 71-page affidavit in support that meticulously describes (among other things) the activity of the Bryant DTO, Jackson's involvement, and how cellphones were being used to further the alleged narcotics conspiracy.  (SEALED Exhibit A-1a.)  The affidavit reiterates many of the things discussed above—but in much more extensive detail.  A credible source had notified agents that Jackson was a multi-kilogram cocaine distributor and provided them with a specific cell phone number he was known to use (513-609-9638).  On February 20, 2018, TFO Whitford observed Jackson and Bryant's interaction at the Hooter's parking lot. He then followed Jackson as he drove his black Lincoln sedan to the Chardon residence where, two days later, packaging materials that tested positive for cocaine were found. Moreover, toll analysis on Jackson's phone revealed that it had communicated with Bryant's phone 412 times between July 4, 2018 and January 14, 2019.

Agents thereafter sought and obtained seven additional wiretaps (one in April, May, June, July, August, September, and October 2019) that were authorized by either Judge Barrett or United States District Judge Susan J. Dlott.  Each wiretap application was accompanied by an affidavit that was equally as long—if not longer—than the original affidavit.  And each affidavit included increasingly more details than the last. Simply put, there is no question that each of the eight wiretap affidavits contained sufficient factual allegations to support a finding of probable cause.

*Necessity Requirement*.  Second, the wiretap applications all satisfied Title III's

6

necessity requirement. As described above, a wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).

That said, the purpose of the necessity requirement is to ensure that wiretaps are not being used as the "initial step in a criminal investigation." *United States v. Gonzalez*, 2021 WL 957323, at *3 (6th Cir. Mar. 15, 2021); *see also United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002) ("This statutory 'necessity requirement' was designed to ensure that wiretapping is not resorted to in a situation in which traditional investigative techniques will suffice to expose the crime."). The necessity requirement, however, is not meant to "foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted but [rather] serves simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *Id*. (cleaned up). "[A]ll that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007) (cleaned up.) Moreover, when deciding if the necessity requirement has been met, "'great deference' is normally paid to the determination of [the] issuing judge." *U.S. v. Alfano*, 838 F.2d 158, 162 (6th Cir. 1988).

Here, each wiretap application contained an affidavit that extensively detailed the government's investigative steps and why the wiretap was necessary. For example,

the affidavit in support of the first wire (*see* SEALED Ex. A-1a) devotes nineteen pages to the necessity requirement. DEA agent David Zummach describes how investigators had utilized confidential informants, undercover agents, grand juries, controlled purchases, witness interviews, search warrants and consent searches, toll records, physical surveillance, trash searches, mail covers, financial investigations, vehicle tracking devises, and other techniques. Yet Agent Zummach still testified that "it is my belief that the interception of wire communications is the only available technique with a reasonable likelihood of identifying the full scope of the above-described conspiracy and securing evidence necessary to prove beyond a reasonable doubt." (*Id.*) AUSA Karl Kadon concurred in Agent Zummach's assessment.

In sum, the wiretaps used here were clearly not the "initial step in the criminal investigation." *Rice*, 478 F.3d at 710. The affidavits in support detail how "other investigative techniques ha[d] been tried and failed or why they reasonably appear[ed] to be unlikely to succeed or be too dangerous." 18 U.S.C. § 2518(1)(c). And while Jackson argues that there were "feasible established investigative alternatives to this wiretap," (Doc. 712), the wiretap affidavits demonstrate that the "agents intended to understand the fullest extent of the conspiracy and every member who was involved, and they were entitled to pursue further leads." *Gonzalez*, 2021 WL 957323 at *4 (citing *United States v. Young*, 847 F.3d 328, 345 (6th Cir. 2017) (rejecting defendant's argument that when agents obtain evidence prior to a wiretap application, the wiretap application should be rendered unnecessary)).

Therefore, given the "great deference" provided to Judge Barrett and Judge Dlott

in approving each of the wiretaps at issue, *see Alfano*, 838 F.2d at 162, the Court finds

that the Government satisfied the necessity requirement of 18 U.S.C. § 2518(1)(c).

### III.    Search of Mr. Jackson's Residence (Doc. 713)

Lastly, Jackson seeks to suppress all evidence obtained from the search of the

Chardon residence.  He makes two arguments in support.  First, Jackson contends that

this evidence is inadmissible as fruit of the poisonous trees stemming from the

improper GPS monitoring and pen register/wiretaps.  But as discussed above, the GPS

tracking device warrant and the wiretap applications were all lawfully executed and

supported by probable cause.  His first argument thus fails.

Next, Jackson contends that the affidavit supporting the Chardon residence

search warrant contained:

- no information that drug trafficking occurred at the Chardon residence;
- no information that Mr. Jackson resided at the Chardon residence; and
- failed to establish a reasonable nexus between the Chardon residence and drug trafficking.

This argument also fails.  Indeed, all such information *was* included in the affidavit.  It

states that "12010 Chardon Lane . . . is the home of Maurice Jackson," and that GPS

monitoring "revealed that Jackson routinely parks his vehicle at [the Chardon

residence[2]]."  (*See* Doc. 732-8, at ¶3(c) & ¶21.)

The affidavit further states that—through the use of GPS monitoring, wiretaps,

and physical surveillance—agents routinely observed the following sequence of events.

Agents would intercept calls or texts between Jackson and Bryant (or other co-

---

[2] In the supporting affidavit, 12010 Chardon Lane is referred to as "Subject Property A3." (*See* Doc. 732-8, p. 14, ¶10(c).)

defendants) in which they would coordinate a drug transaction. Jackson would then drive his black Lincoln sedan to the predetermined location, call or text Bryant (or another co-defendant) to notify them that he was there, and then exit his car and interact with them (often while carrying a black backpack, which corroborated information previously received by law enforcement that he used a black bag to conceal drugs or drugs proceeds). Sometimes Jackson would drive directly *from* the Chardon residence *to* the predetermined location of the suspected drug transactions. Other times, Jackson would drive *from* the location of the suspected drug transaction directly back *to* the Chardon residence. And on a few occasions, Jackson did both (*i.e.* drove directly from the Chardon residence to the suspected drug transaction and then drove directly back to the Chardon residence). Thereafter, agents would conduct a trash search at the Chardon residence a few days later. And each of the four times they did so, agents recovered packaging materials consistent with the size of a kilogram of narcotics that would subsequently test positive for cocaine.

This repeated behavior was witnessed on numerous occasions. (*See id.*, ¶¶19-21) (describing suspected drug transaction on February 20, 2019); (*see also id.*, ¶30) (describing suspected drug transaction on April 29, 2019); (*see also id.*, ¶¶38-40) (describing suspected drug transaction on May 28, 2019); (*see also id.*, ¶¶42-45) (describing suspected drug transaction on May 31, 2019.) These were not the only suspected drug transactions the affidavit describes. But rather, they are simply examples of a few of the suspected drugs transactions wherein Jackson utilized the Chardon residence.

In short, the affidavit clearly established a reasonable nexus between Jackson, 12010 Chardon Lane, and drug trafficking.  Jackson's argument that the Chardon residence search warrant lacked probable cause thus lacks any merit.

## CONCLUSION

In sum, Jackson's arguments to suppress the evidence obtained from the GPS tracker on his car, the wiretaps on his phone, and the search of 12010 Chardon Lane are not well-taken.  Each of the warrants supporting the GPS tracker, the wiretaps, and the search of Chardon residence were obtained lawfully and supported by probable cause.  Accordingly, Jackson's Motions to Suppress (Docs. 711, 712, 713) are all **DENIED**.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND